IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MARIO D. MARIN and REYES MARIN,

        Plaintiffs,

V.                                                  Case No. 12-CV-448 WJ/LFG

GARY KING, ATTORNEY GENERAL OF NEW MEXICO,
Individually; STEVEN SUTTLE, ASSISTANT ATTORNEY
GENERAL OF NEW MEXICO, individually; HEATHER
FERGUSON GREENHOOD; PATRICIA FEESER NORRIS, D.V.M.;
MAX SALAS, CRIMINAL AGENT, NEW MEXICO DEPARTMENT
OF PUBLIC SAFETY/NEW MEXICO STATE POLICE, individually;
BRICE CURRENT, LIEUTENANT, SAN JUAN COUNTY SHERIFF'S
OFFICE, individually; and SAN JUAN COUNTY, NEW MEXICO,
ACTING THROUGH THE SAN JUAN COUNTY SHERIFF'S OFFICE,

        Defendants.

### MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT STEVEN SUTTLE'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court on Defendant Steven Suttle's Motion for Summary Judgment **(doc. 17)**, filed June 29, 2012. The Court finds that Defendant's motion is well taken and shall be **GRANTED**.

### BACKGROUND

The Court makes the following summary of material facts based on the briefs and exhibits filed in this case, viewed in the light most favorable to the Plaintiff and making every permissible factual inference in favor of Plaintiff, for purposes only of the resolution of the present Motion for Summary Judgment.

Sometime in 2007, Defendant Attorney General King convened a group known as the Attorney General's Animal Cruelty Task Force ("Task Force"). Defendant Steven Suttle, an Assistant Attorney General, was known as the head of Task Force; Defendant Heather

Ferguson,[1] an employee of the non-profit organization Animal Protection New Mexico ("APNM"), was known as the Task Force's coordinator. The purpose of the Task Force was to disseminate information about enforcement of a recently-enacted law banning dogfighting and cockfighting (N.M.S.A. 1978, § 30-18-9, enacted in 2007), and to share resources available to combat animal cruelty. It met periodically and representatives of various local law enforcement authorities attended at various times. There was no formal membership and there were no formal titles within the group. When Suttle and Ferguson spoke together at an animal cruelty prevention conference in 2009, they were identified as the head and coordinator of the task force respectively. Ferguson was also identified as the Task Force coordinator in some media outlets. Throughout this time, Suttle was aware that Ferguson was not a peace officer or law enforcement officer of any kind, and had not received any law enforcement training.

During 2008 and 2009, Ferguson, Feeser,[2] and law enforcement officials representing various local entities went onto a number of private properties to search for signs of illegal dogfighting or cockfighting, and seized animals that appeared to be involved in such activities, sometimes euthanizing those animals. The Task Force discussed euthanasia of birds seized on one of these raids on February 27, 2008, at a meeting attended by Ferguson, Feeser, and Suttle, among others. Ferguson also e-mailed Suttle about these raids, including the following messages:

> Just a reminder that we will have a task force meeting Tuesday Jan 8th at 2 p.m. at Sheriff White's office in Albuquerque to debrief about the raid in Otero. [E-mail from Ferguson to Suttle and others, Jan. 8, 2008 (doc. 31-6, at 17).]
>
> New Mexico officially has the country's first cockfighting bust of the year. . . . Many thanks to Dr. Feeser, who came to the scene with me at midnight to work

---

[1] Throughout the events at issue here, Defendant Heather Ferguson Greenhood was referred to as and went by the name Heather Ferguson. Therefore, the Court will refer to her as Heather Ferguson.
[2] Throughout the events at issue here, Defendant Patricia Feeser Norris was referred to as Patricia Feeser. Therefore, the Court will refer to her as Patricia Feeser.

with the roosters. She has been invaluable in these cases for . . . euthanizing the injured animals. [E-mail from Ferguson to Suttle and others, Jan. 4, 2009 (doc. 31-6, at 9).]

"One hundred five roosters found at Elias' home were euthanized after agents found them in 'very, very poor health.'" [quoted from Jeff Proctor, "Cockfighting Ring May Have National Scope," Albuquerque Journal, January 9, 2009; article forwarded by e-mail from Ferguson to Suttle and others, January 9, 2009 (doc. 31-6, at 12).]

Dona Ana County has planned a blitz this weekend on cockfighting. . . . I am flying in some personnel from the Humane Society of the United States to assist and it's likely that they are going to bring the camera crew from Animal Planet to film our work. If anyone can make it from the AG's office to help, it would be greatly appreciated. [E-mail from Ferguson to Suttle and others, April 1, 2009 (doc. 31-6, at 3).]

Over 300 roosters have been seized. . . . Moving to the next two locations now and another few hundred roosters! [E-mail from Ferguson to Suttle and others, April 4, 2009 (doc. 31-6, at 2).][3]

In all, 720 birds have been seized and euthanized today with another 100+ birds still on the property which will be caught by the suspect and turned over to animal control. Not included here is the hundreds of eggs we also seized from the property. [E-mail from Ferguson to Suttle, May 5, 2009, doc. 31-6, at 5.]

On April 29, 2009, Defendants Ferguson, Feeser, Salas, Current, and other law enforcement officers came to Plaintiffs' ranch near Bloomfield, New Mexico on the suspicion that Plaintiffs were engaging in cock fighting, a petty misdemeanor under New Mexico law. *See* N.M.S.A. 1978, § 30-18-9. There, Defendants[4] executed three successive search warrants and seized approximately 700 chickens, roosters, and chicks. According to Plaintiffs, the search warrants were based on knowingly false statements by Ferguson and Feeser, including that (1) Plaintiffs possessed illegal veterinary pharmaceuticals, sufficient to support felony charges; (2) agents of the office of the Inspector General of the United States Department of Agriculture were

---

[3] Suttle and Ferguson also exchanged eight e-mails on April 17, 2009, with the subject "Cock fight." Although the messages appear to discuss details of an upcoming raid – possibly the location and people involved either as law enforcement or targets – because the e-mails are redacted, the Court is unable to determine their precise meaning. There is no evidence others were included in this e-mail chain.

[4] It is undisputed that neither Defendant King nor Defendant Suttle was present during the events at issue.

coordinating with Ferguson in the operation; (3) the poultry would have to be euthanized because they had been illegally injected with steroids that could not be allowed to enter the food chain and contaminate other poultry (although Defendants had not tested the birds for the presence of unlawful substances); and (4) some of the poultry needed to be euthanized because they were suffering.  Plaintiffs also allege that Defendants coerced Plaintiffs into signing a form granting consent to euthanize the poultry, by falsely saying that (1) if Plaintiffs did not do so, law enforcement officers would be required to seize the birds and hold them until the conclusion of any criminal proceedings, at a cost to Plaintiffs of $6/day per bird, and (2) if Plaintiffs consented to the birds' euthanasia, they would have an easier time with the felony charges they were facing. After Plaintiff Reyes Marin signed the consent form, Defendants euthanized all the birds they seized, and crushed a large number of poultry eggs also found at the ranch.  On May 5, 2009 Ferguson e-mailed Suttle about the seizures and euthanasia at Plaintiffs' ranch.

Plaintiffs have filed two claims under 42 U.S.C. § 1983, alleging violations of their Fourteenth Amendment right not to be deprived of property without due process of law, and their Fourth Amendment right to be free from unreasonable searches and searches.  In response, Defendant Suttle has filed this Motion for Summary Judgment, raising the defense of qualified immunity.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving

party's case.  Once that burden is met, the nonmoving party must put forth specific facts showing that there is a genuine issue of material fact for trial; he may not rest on mere allegations or denials in his own pleadings.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57 (1986).  In order to avoid summary judgment, the nonmoving party must put forth enough evidence that a reasonable jury could return a verdict in the nonmovant's favor.  *Id.* at 249.  A mere scintilla of evidence in the nonmovant's favor is not sufficient.  *Id.* at 252.

When a government official raises the defense of qualified immunity in a motion for summary judgment, the plaintiff must produce facts sufficient to show both that defendant's alleged conduct violated the law and that the law was clearly established when the alleged violation occurred.  *Bruning v. Pixler*, 949 F.2d 352 (10th Cir. 1991).  Only then must defendant bear the usual summary judgment movant's burden of showing that no material issues of fact remain that would defeat claim of qualified immunity.  *Id.*; *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009) (if plaintiff succeeds in carrying his two-fold burden of production, the burden shifts back to the defendant and the analysis reverts to a traditional summary judgment analysis).

## DISCUSSION

Plaintiffs have alleged violations of two distinct Constitutional rights: their Fourth Amendment right to be free from unreasonable searches and seizures, and their Fourteenth Amendment right to be free from deprivations of property without due process of law.  They contend that the search of their ranch and seizure of their poultry was unreasonable because the warrants under which they were executed were based upon "knowingly false statements by defendants Feeser and Ferguson."  Compl. ¶ 21 (doc. 1, at 7).  Plaintiffs also allege that Defendants coerced them into consenting to the destruction of the poultry seized during the search, in a violation of their substantive and procedural due process rights.

5

This Court finds without question that if these allegations are true, Plaintiffs suffered violations of their Constitutional rights.  The Fourth Amendment requires that a search or seizure be reasonable and supported by probable cause, which exists "where the facts and circumstances within the arresting officer's knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to have the belief that an offense has been or is being committed by the person to be arrested." *Koch v. City of Del City*, 660 F.3d 1228, 1239 (10th Cir. 2011) (quoting *United States v. Alonso*, 790 F.2d 1489, 1496 (10th Cir.1986)).  A warrant based on knowingly false statements is by definition invalid, and any subsequent search is unreasonable.  *See Franks v. Delaware*, 438 U.S. 154, 164-65 (1978) ("[W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a truthful showing . . . . in the sense that the information put forth is believed or appropriately accepted by the affiant as true." (internal quotation marks and citation omitted)).

Further, under the Fourteenth Amendment "the State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982).  Destruction of seized property requires that the owner receive notice that his property right will be terminated and the opportunity to protest the proposed action.  *See, e.g.*, *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14-15 (1978); *DiCesare v. Stuart*, 12 F.3d 973, 978 (10th Cir. 1993) (plaintiff presented legitimate due process claim where his horses were seized and sold without notice or opportunity for plaintiff to contest the seizure and disposal of his property).  The Court also notes that New Mexico law sets forth procedures for the seizure and disposition of livestock such as poultry, which, according to Plaintiffs' allegations, do not appear to have been followed.  *See*

N.M.S.A. §§ 30-18-1.1, 1.2 (requiring a court hearing and notice to the owner following the seizure of an animal and before disposing of seized animals).

However, to resolve Suttle's Motion for Summary Judgment, at issue is not whether the alleged acts comprise violations of Constitutional rights, but whether Suttle can be held liable for them. It is undisputed that Suttle was not present during the search of Plaintiffs' ranch and seizure and destruction of their poultry. Instead, Plaintiffs allege that Suttle is liable in his role as supervisor to Ferguson, who was present and, according to Plaintiffs, directed the law enforcement officers in their search, seizure, and destruction of the poultry.

I.   **Whether Defendant's Alleged Conduct Violated the Law**

Under 42 U.S.C. § 1983, a defendant sued in an individual capacity may be subject to personal liability and/or supervisory liability. Supervisory liability "allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, [or] implements . . . a policy . . . which subjects, or causes to be subjected that plaintiff to the deprivation of any rights . . . secured by the Constitution." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir.2010) (quotation omitted). Section 1983 does not authorize liability under a theory of respondeat superior. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, the plaintiff must establish the defendant-supervisor's "'direct personal responsibility for the claimed deprivation of a constitutional right.'" *Porro v. Barnes*, 624 F.3d 1322, 1327 (10th Cir. 2010) (quoting *Trujillo v. Williams*, 465 F.3d 1210, 1227 (10th Cir. 2006)); *see also Novitsky v. City of Aurora*, 491 F.3d 1244, 1254 (10th Cir. 2007) (requiring that the defendant have "personally participated" in the constitutional deprivation and holding that mere presence at the scene was insufficient). To do so, a plaintiff must show that "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of

constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds*, 614 F.3d at 1199.

Here, the obstacle Plaintiffs face in proving supervisory liability is establishing that Suttle was, in fact, Ferguson's supervisor. In cases alleging supervisory liability, the supervisor-subordinate relationship is generally clearly established before the events giving rise to the claim. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 668 (2009) (inmate placed in maximum security prison by FBI agents sued, among others, the Attorney General of the United States and the Director of the FBI – "officials who were at the highest level of the federal law enforcement hierarchy"); *Dodds*, 614 F.3d at 1199 (holding sheriff liable for unconstitutional bail policy of county jail, although he had no knowledge of the policy, because "Oklahoma law charged [him] as sheriff with the responsibilities of running the county jail and accepting bail . . ."); *Brown v. Montoya*, 662 F.3d 1152, 1165 (10th Cir. 2011) (plaintiff alleging violation of due process by his probation office also brought supervisory liability suit against secretary of corrections, where department of corrections was responsible under state law for administering probation programs); *J.W. v. Utah*, 647 F.3d 1006, 1011 (10th Cir. 2011) (plaintiffs alleging caseworker violated their constitutional rights also brought supervisory liability suit against caseworker's direct supervisor). However, the parties here disagree whether Suttle supervised Ferguson. No such direct relationship exists here, as it is undisputed that Ferguson was not employed by the Attorney General's Office.

Plaintiffs' argument that Suttle supervised Ferguson relies heavily on two kinds of evidence. First, they offer evidence that Suttle was known as the "head" of the Task Force (which he admits) and Ferguson was known as the "coordinator" of the Task Force (which she admits; Suttle does not recall ever hearing Ferguson described as such). Specifically, Plaintiffs

point to (1) a Declaration by Ronald Barron, President of the New Mexico Game Fowl Association, in which he states that when he telephoned Suttle about the raids, Suttle told him that he was the "head of the Task Force" (doc. 31-5 at 1); (2) a Declaration by Marcy Britton that at the 2009 New Mexico Humane Conference, at a breakout session on cockfighting, "Mr. Suttle was introduced as the 'head' of the Attorney General's Animal Cruelty Task Force'" and Suttle "introduced Heather Ferguson as the 'lead coordinator'" of the Task Force (doc. 31-7, at 2-3); (3) news stories from two websites in which Ferguson is described as the Task Force's "coordinator" (doc. 31-2, at 1-2, 4); and (4) biographies for instructors at the 2010 New Mexico Humane Conference, describing Ferguson as the Task Force's "coordinator" (doc. 31-2, at 6).[5]

However, both Suttle and Ferguson deny that the titles of "head" and "coordinator" held the significance that Plaintiffs ascribe to them. Suttle identified the head's role as purely organizational: "I was known as the head of the task force. I was a point person. When people would call into the office, the calls would come to me, and I suppose that I identified myself as [head]. But that was a Coca-Cola title." Doc. 31-1, at 5. Similarly, Ferguson described Suttle's role as "to be a liaison for [the Attorney General]'s office for the task force to help us facilitate holding the meetings at the Attorney General's office, providing support in the drafting of legislation that the task force – also operated as sort of a think tank." Doc. 47-1, at 3. Ferguson also stated that Suttle "would help to guide the agendas of the meetings of the task force. He advised and guided our work on amendments to the animal cruelty law . . . . He would give guidance in, you know, pointing out like how I was going to say this." Doc. 47-1, at 6. Suttle expressly denied ever being called "director" of the Task Force because "[t]hat's a term of art

---

[5] During Suttle's deposition, Plaintiffs' counsel referred to a 2009 conference biography referring to Suttle as the Task Force's "director." However, that document has not been submitted to the Court.

within state government" and "I would never have identified myself as a director of anything, for that very reason." Doc. 31-1, at 6, 12.

As for "coordinator," Suttle testified that he did not recall ever hearing Ferguson described as coordinator or lead coordinator.  However, he denied having delegated any authority to Ferguson, or having any authority over her or her actions on the raids.  When asked if she held the title of coordinator, Ferguson stated,

> I think – no one had an assigned title.  That was a term of art, you know, within –
> as to if someone was going to try come up with a term – you know, as a volunteer
> for this task force, what do you do.  But not one had an assigned title or an
> appointed title.

Doc. 47-1, at 4.  She also acknowledged that when she attended training sessions in Suttle's company, addressing New Mexico law enforcement officers, he introduced her as the Task Force coordinator.  She pointed out, however, that both in her interactions with Suttle on the task force and her interactions with local law enforcement on raids, she was also an employee of APNM and her actions were all within her professional capacity as an APNM employee.

The significance that Plaintiffs give to these titles is based on the premise that the Task Force as an independent entity had the authority to conduct raids, and that therefore, being the head of the Task Force gave Suttle the authority to command other members, including Ferguson, the coordinator.  However, Plaintiffs have provided no evidence in support of this contention, and the facts here do not demonstrate that the Task Force had this authority.  Both Suttle and Ferguson state that the Task Force was an ad hoc group for sharing informational resources around enforcing animal cruelty laws, and that it had no independent authority of its own.  Both state that there was no appointment process and no fixed membership in the Task Force, that representatives of different local law enforcement entities attended according to

interest and convenience, and that raids were conducted by local law enforcement entities, not by the Task Force.  As Suttle explained:

> This was not a task force in the sense of a HIDTA task force. . . .  [A] High Intensity Drug Trafficking Area [is] where actual agencies get together under a director and are given tasks and duties.  This was an ad hoc committee of people who got together to discuss these issues and exchange information and tips about where there might be cockfighting, gang fighting, what to do about it, what procedures to take.  The people who attended this, with the exception of Ms. Ferguson, of course, were all certified law officers in their jurisdictions who were trying to enforce this new law.
>
> When you keep calling it a task force, you leave the impression, as you have in your written materials, that there was some sort of official appointment, official duties handed out to different people on this so-called task force.  I have always thought it was an unfortunate name, but I didn't pick it.

Doc. 33-1, at 13.  Further, the terms head and coordinator primarily appear in the context of providing general information and resources, as in presenting at conferences or interacting with the public and the media, rather than in any investigative context.

In addition, Suttle testified that he never trained Ferguson, or directed that she be trained, in Fourth Amendment violations, due process, the seizure of private property, or the euthanasia of animals; did not review any of the search warrants executed in the raids; did not ask Ferguson about the warrants; did not direct Ferguson how to conduct the raids; and did not tell Ferguson she should not arm herself at the raids or wear a jacket with "some sort of official insignia." Doc. 33-1, at 17-18.  Plaintiffs offer these facts in support of their argument that Suttle acted with "deliberate indifference" by failing to exercise his responsibilities as a supervisor.  *See* Doc. 31, at 18-19.  However, they plausibly support the proposition that Suttle was not Ferguson's supervisor.

Conversely, Plaintiffs have provided no evidence directly linking the Task Force as an entity to either the raids generally or the raid on their property.  The search warrant authorizing

one of the searches and seizures of birds at Plaintiffs' ranch was issued by the Magistrate Court of San Juan County, and the affidavit supporting the warrant was sworn by Defendant Max Salas of the New Mexico State Police. Doc. 31-3. Throughout the relevant period, Ferguson was employed by APNM, a private entity deeply involved with preventing animal cruelty in New Mexico. Although at one time Suttle directed the Attorney General's Divisions of Investigations, Prosecutions, and Appeals, or "the divisions [within the Attorney General's Office] that might actually go and do something [about animal cruelty]," by 2009 Suttle no longer had that authority. Doc. 33-1, at 4. Rather, his role was to "work the legislature and advise Mr. King on criminal law matters." Doc. 33-1, at 3. Although the Attorney General's Office has the authority to investigate animal cruelty (but not to prosecute it), Plaintiffs provide no evidence it did so through the Task Force.[6] In short, Plaintiffs have offered no evidence that the Task Force directed local law enforcement in any way. The distinction between circulating information that enables local law enforcement agencies to pursue animal cruelty investigations, and directing or conducting those investigations, may be slim, but it remains significant.

The second kind of evidence on which Plaintiffs rely to prove a supervisory relationship shows that Suttle knew both that Ferguson was going on the raids, and that on the raids, birds were being seized and euthanized. However, in the absence of other evidence that Suttle was Ferguson's supervisor, his knowledge of her behavior alone does not create a causal link between Suttle's role on the Task Force and the execution of the raids.

---

[6] Ferguson's April 1, 2009 e-mail, referenced in the background above, asked "if anyone can make it from the AG's office to help" in a Dona Ana County raid scheduled for the upcoming weekend. However, in addition to Suttle, Ferguson included three recipients described as affiliated with "Investigation NMAGO [New Mexico Attorney General's Office]," who, unlike Suttle, would have the authority to provide investigative assistance regardless of their relationship to the Task Force. Further, there is no evidence anyone from the Attorney General's Office assisted at that raid.

Therefore, the Court finds there existed no supervisory relationship between Suttle and Ferguson sufficient to hold Suttle liable for any of Ferguson's alleged constitutional violations.

## II.     Whether the Law Was Clearly Established

Turning to the second prong of the qualified immunity analysis, the Court finds that even if Suttle was Ferguson's supervisor, he is nonetheless entitled to qualified immunity because the law was not sufficiently established to put a reasonable official in Suttle's position on notice that his behavior violated Plaintiffs' rights.

Plaintiffs argue that the constitutional rights at issue were clearly established at the time of the raid. As discussed above, the Court agrees with this characterization. However, Plaintiffs' argument misstates the analysis required to determine qualified immunity. It is correct that a right is clearly established when, as here, "a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains." *Dodds*, 614 F.3d at 1206 (quotation omitted). However, for a supervisor to be liable, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 1206. It is clear to any reasonable official that a state actor cannot search private property without a valid warrant or destroy private property without due process. It is not clear, however, that Suttle was on notice that his role in the Task Force violated those rights.

As discussed above, the undisputed facts demonstrate that the Task Force functioned as a forum for sharing information, not as an independent entity directing law enforcement activities. Consequently, the Task Force, and Suttle's role within it, can best be described as advisory, not supervisory. Plaintiffs have supplied no authority suggesting that the leader of an advisory group is responsible for the uses that other independent entities, such as local law enforcement, make of

the information disseminated by that group.  To impose supervisory liability on any individual or entity acting in an advisory capacity to would be to extend the theory of causation underlying supervisory liability too far.  *C.f. Dodds*, 614 F.3d at 1198 (supervisory liability is an issue "of causation, i.e., whether the supervisor's conduct was a proximate cause of the violation of the plaintiff's constitutional rights" (internal quotation omitted)).

Consequently, this Court finds that Plaintiffs have failed to meet their burden to produce facts countering Suttle's qualified immunity defense.

The Court acknowledges that Suttle's sworn statement in his Declaration is contradicted by his subsequent deposition testimony and other evidence.  Namely, in ¶ 17 of his Declaration, Suttle claimed:

> I never had knowledge of Ms. Ferguson's alleged conduct in the "numerous raids" referred to in Paragraph 17 of the Complaint, or in the alleged raid of Mr. Marin's property.  I have never had knowledge that Ms. Ferguson directed the killing of animals or crushing of eggs in any fashion.

Doc. 17-1 at 2.

As outlined in the facts section above, and as Suttle ultimately admitted in his deposition, the evidence clearly shows otherwise.  The Court, like Plaintiffs, finds these contradictions troubling.  But Suttle's prevarication in his Declaration does not alone defeat his qualified immunity.  Lying in a Declaration does not prove either that Suttle was Ferguson's supervisor, or that, if he was, the law was so clearly established that as a reasonable official, he was on notice that his behavior would cause the constitutional violations.  In light of the disparities between Suttle's statements, Plaintiffs were granted additional discovery, providing the opportunity to depose Ferguson on the issue of Suttle's knowledge.  *See* doc. 45.  Suttle and Ferguson are the

key figures for the issue of supervisory liability.  Thus, any prejudice Plaintiffs have suffered from Suttle's misrepresentations has been addressed.[7]

Finally, after Plaintiffs' Second Rule 56(d) Motion for Additional Discovery (doc. 31) was granted (doc. 45), Plaintiffs filed a Supplemental Response in Opposition to Defendant Steve [sic] Suttle's Motion for Summary Judgment (doc. 47).  Defendant then filed an opposed Motion for Leave to File Supplemental Reply in Support of Motion for Summary Judgment (doc. 48, filed March 8, 2013; opposed in doc. 49, filed March 19, 2013), still pending.  In light of the Court's resolution of the Motion for Summary Judgment in Suttle's favor, the Court DENIES Defendant's Motion for Leave to File Supplemental Reply in Support of Motion for Summary Judgment as moot.

Having found that Suttle is entitled to qualified immunity, this Court accordingly rules that his Motion for Summary Judgment is GRANTED.

## CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** Defendant Steven Suttle's Motion for Summary Judgment (**doc. 17**), and **DENIES** Defendant Steven Suttle's Motion for Leave to File Supplemental Reply in Support of Motion for Summary Judgment (**doc. 48**) as moot.

**SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE

---

[7] Any further discovery into these matters would constitute a fishing expedition, and violate the very purpose of qualified immunity, which is "to strike a balance between the importance of a damages remedy to protect the rights of citizens, [and] the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *McFall v. Bednar*, 407 F.3d 1081, 1086-87 (10th Cir. 2005).  As the Supreme Court has noted, "[E]ven such pretrial matters as discovery are to be avoided if possible, as inquiries of this kind can be peculiarly disruptive of effective government." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).