IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MARIO D. MARIN and REYES MARIN,

        Plaintiffs,

V.                                                                     Case No. 12-CV-448 WJ/LFG

GARY KING, ATTORNEY GENERAL OF NEW MEXICO,
Individually; STEVEN SUTTLE, ASSISTANT ATTORNEY
GENERAL OF NEW MEXICO, individually; HEATHER
FERGUSON GREENHOOD; PATRICIA FEESER NORRIS, D.V.M.;
MAX SALAS, CRIMINAL AGENT, NEW MEXICO DEPARTMENT
OF PUBLIC SAFETY/NEW MEXICO STATE POLICE, individually;
BRICE CURRENT, LIEUTENANT, SAN JUAN COUNTY SHERIFF'S
OFFICE, individually; and SAN JUAN COUNTY, NEW MEXICO,
ACTING THROUGH THE SAN JUAN COUNTY SHERIFF'S OFFICE,

        Defendants.

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS' MOTION TO RECONSIDER COURT'S MEMORANDUM OPINION AND ORDER GRANTING STEVEN SUTTLE'S MOTION FOR SUMMARY JUDGMENT**

THIS MATTER comes before the Court on Plaintiffs Mario D. Marin and Reyes Marin's Motion to Reconsider Court's Memorandum Opinion and Order Granting Defendant Steven Suttle's Motion for Summary Judgment **(Doc. 52)**, filed April 8, 2013. The Court finds that Plaintiffs' motion is not well taken and shall be **DENIED**.

### BACKGROUND

This motion arises from Plaintiffs' civil suit pursuant to 42 U.S.C. § 1983, alleging that Defendants violated their Fourth and Fourteenth Amendment rights when they illegally searched Plaintiffs' ranch, and seized and destroyed upwards of 700 roosters, hens, and chicks, and approximately 200 eggs. As relevant to this motion, Plaintiffs allege that during the raid

Defendant Ferguson[1] was acting in her capacity as a member of the Attorney General's Animal Cruelty Task Force ("Task Force"), and that Suttle, although not present during the raid, is liable for her violations of Plaintiffs' constitutional rights in his capacity as Task Force supervisor. Suttle filed a motion for summary judgment, asserting qualified immunity (**doc. 17**). The Court granted this motion in a Memorandum Opinion and Order issued on March 25, 2013 (**doc. 50**). Plaintiffs now move that the Court reconsider its Order under Federal Rules of Civil Procedure 59(e) or 60(b), on the basis of newly-obtained e-mails between Ferguson, Suttle, and other members of the Attorney General's Animal Cruelty Task Force ("Task Force").[2]

## ANALYSIS

A litigant subject to an adverse judgment may file either a motion to alter or amend the judgment under Fed.R.Civ.P. 59(e), or a motion seeking relief from the judgment under Fed.R.Civ.P. 60(b). Here, because Plaintiffs' motion was served within ten days of the judgment, it is considered a motion to alter or amend the judgment under Rule 59(e). *See Allender v. Raytheon Aircraft Co.*, 439 F.3d 1236, 1242 (10th Cir. 2006). Such a motion is an extraordinary remedy and "should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1212 (10th Cir. 2012). Because discovery in this case

---

[1] During the events at issue, Heather Ferguson Greenhood went by the name Heather Ferguson. Because all pleadings in this case refer to her by that name, the Court does so as well.
[2] Because they did not receive the new e-mails until May 9, 2013, Plaintiffs offered this evidence only in their Reply to Suttle's Response to the instant motion (**doc. 62**), filed May 14, 2013. Therefore, the Court granted Suttle leave to file a Surreply (**doc. 68**), filed May 31, 2103. The Court also granted Plaintiffs leave to file a Surreply addressing allegations of misconduct by counsel in Suttle's surreply (**doc. 73**) filed June 5, 2013. Although the Court finds for Suttle on the merits, it also finds the allegations of misconduct by Plaintiffs' counsel meritless.

2

has been stayed pending resolution of various qualified immunity defenses,[3] Plaintiffs' efforts to obtain evidence have been limited. Here, Plaintiffs offer newly-discovered e-mails between Defendants Suttle, Ferguson, and King, as well as other members of the Task Force and Attorney General's Office, obtained through an Inspection of Public Records Act ("IPRA") request served on the Attorney General's Office by Marcy Britton, an animal-rights activist not a party to this case.[4]

Plaintiffs' evidence can be roughly divided into four categories. First, they submit additional evidence about Suttle's role in the Task Force. Second, they offer additional e-mails between Ferguson, Suttle, King, and other members of the Task Force that they categorize as "[e]vidence related to Ferguson's work with Suttle, on behalf of the AGO and the [Task Force] in working in the legislature for funding, and her involvement with policy within the AGO." Doc. 62 at 9. Third, they offer additional e-mails showing that the Task Force worked more closely with law enforcement in conducting cockfighting raids than was previously evident. Finally, Plaintiffs offer e-mails that they believe show express delegation of law enforcement authority to Ferguson. The Court finds that although this evidence provides a more fleshed-out portrait of the Task Force's activities, none of it alters its previous conclusion that Suttle is entitled to Qualified Immunity.

---

[3] Discovery is currently stayed pending resolution of Defendant Gary King's Motion for Summary Judgment on the grounds of qualified immunity (**doc. 58**), filed May 9, 2013. Plaintiffs have filed a Motion for Discovery Pursuant to Rule 56(d) and Declaration of Counsel (**doc. 67**), filed May 28, 2013.

[4] Britton filed the original IPRA request on June 30, 2009. She also filed a lawsuit against the Attorney General's Office on January 13, 2012. Suttle objects to the Court considering the additional e-mails on the grounds that they are not new evidence; because Plaintiffs' counsel also represent Britton in her state case, Suttle contends the documents in question were accessible to Plaintiffs' counsel from at least the date the state court complaint was filed. However, Plaintiffs' Surreply makes clear the new e-mails were not received in the Britton litigation until May 9, 2013. Suttle also argues that use of the e-mails produced to Britton in the state case violates the "purpose and spirit" of the Court's order to stay discovery proceedings here. Doc. 68 at 14. However, he provides no authority in support of this contention, and the Court sees no reason to exclude materials acquired through proceedings in an entirely different jurisdiction. The purpose of staying discovery pending resolution of a qualified immunity defense is to ensure that government officials remain "free from the burdens of discovery." *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009). This principle does not protect Defendants from the use of documents acquired by other means in resolving the very issue of qualified immunity.

### A. Suttle's Role in the Task Force

Plaintiffs offer two pieces of evidence intended to show that Suttle was the supervisor of the Task Force. First, they provide an excerpt from the 2012 Annual Report for the New Mexico Attorney General's Office, which describes the functions of General Counsel R. David Peterson as follows: ". . . He also manages complex major litigation; is a member of the criminal case intake evaluation triage team; supervises the AG's Animal Cruelty Task Force and coordinates Animal Welfare issues with outside agencies; . . ." Doc. 52, Ex. 1, at 8. Plaintiffs allege that because Peterson succeeded Suttle with respect to the Task Force, "it is logical, and a reasonable inference can be drawn, that Suttle possessed the same supervisory authority as his successor." Doc. 52 at 2.

Plaintiffs also offer an affidavit from Britton, who states that while attending the quarterly meeting of the New Mexico Board of Veterinary Medicine, she met Michael Sandoval, an investigator with the Attorney General's office who had been present at the raid on Plaintiffs' property. According to Britton, he told her that he had been sent on the raid "to assist," and when she asked who had sent him there, he replied, "You will have to call Steve Suttle for that information. He is in charge of the Animal Cruelty Task Force."[5] Doc. 52, Ex. 2, at 10. Plaintiffs offer this as further evidence that Suttle supervised the Task Force. They further allege that because this evidence identifies Suttle as "supervisor" of the Task Force, Suttle therefore had supervisory authority over Ferguson, as a member of the Task Force.

The Court does not agree. First, Plaintiffs offer no evidence to support their argument that Peterson's position as "supervisor" can be imputed to his predecessor. Second, in its previous order this Court already found that Suttle was referred to (and acknowledged that he

---

[5] Suttle argues that Sandoval's statement to Britton is inadmissible as hearsay. However, as Plaintiffs correctly point out, a statement by a party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, is not hearsay. Fed.R.Evid. 802(d)(2)(D).

was referred to) as the "head" of the Task Force. The annual report does not define "supervises" or detail a supervisor's responsibilities, and Plaintiffs have provided no evidence that the generic term "supervisor" differs from and confers greater authority than the term "head." Nor does Sandoval's statement to Britton make clear what responsibilities Suttle possessed with regard to the Task Force. Third, and more importantly, finding that Suttle was the "supervisor" of the Task Force would not alter the Court's analysis in its previous order. The Court's earlier finding was that the Task Force was an advisory body only with no independent authority to conduct raids, and the raids were carried out by state and local law enforcement entities. Thus, even if Suttle supervised the Task Force, in the absence of any authority on the part of the Task Force to act in a law enforcement capacity, that supervision does not in itself create an affirmative link with acts undertaken by Ferguson on the raids.

### B. Ferguson's Legislative and Funding Work with Suttle

In the second category of evidence, Plaintiffs offer e-mails showing that Ferguson worked to obtain funding for the Task Force from the legislature and to create a permanent bureau or division for animal cruelty prosecutions; worked with Suttle on draft legislation; had access to "confidential law enforcement information;" planned a training seminar for law enforcement officers and prosecutors that involved "sensitive" material; described the Task Force as having "some work coming up with law enforcement;" and noting that "critical structure within the task force" was going to be put into place. Doc. 62, at 9. The Court finds that this evidence is irrelevant to the issue of supervisory liability for any acts occurring on the raids. None of these e-mails relate to the raids or to Ferguson's role in the raids, nor do they demonstrate a link between Suttle and Ferguson's alleged constitutional violations. They simply

show Ferguson and Suttle working together for funding and legislation related to the prevention of animal cruelty, which are the Task Force's primary goals.

### C. The Task Force's Activity on the Raids and Delegation of Law Enforcement Authority to Ferguson

In the third category of evidence, Plaintiffs offer a number of e-mails from Ferguson to Suttle, King, and other Task Force members that portray the Task Force as taking a more active role in the cockfighting raids than was previously clear. In particular, some of the e-mails by Ferguson (1) describe Ferguson as "serv[ing] search warrants" on a property with local law enforcement officers, Doc. 62-1, Ex. B-1, at 9; (2) describe raids as "the first coordinated task force raid of a cockfighting pit" and "[the Task Force's] first large-scale cockfighting raid," Doc. 62-1, Ex. B5, at 16, Doc. 62-2, Ex. B-6, at 1;[6] (3) relay expressions of gratitude by local law enforcement for the Task Force's assistance on the raids, Doc. 62-1, Ex. B2, at 11-12; and (4) refer to animal cruelty cases as being prosecuted or investigated by the Task Force (sending a veterinarian for special training would improve "our chances of successful prosecutions of the cases that the task force is working on," Doc. 62-1, Ex. B4, at 15; at a raid "we charged six individuals with cockfighting," Doc. 62-2, Ex. B6-ii, at 3; and "reviewing evidence from this case" resulted in information that "should further help the two dogfighting cases we have in Dona Ana," Doc. 62-2, Ex. B6-iii, at 4). Plaintiffs contend that these e-mails show the Task Force, and Ferguson on behalf of the Task Force, exercising law enforcement authority; that, therefore, the Task Force is more than simply an advisory body; and that Suttle is liable for Ferguson's acts.

The final category of evidence shows that Ferguson requested support in creating a patch or logo to identify Task Force members in a variety of contexts, including when present on raids.

---

[6] Plaintiffs offer the e-mail found in Ex. B-6 a second time, in Ex. B-6-i, without acknowledging it is the same e-mail. Doc. 62 at 7.

After arranging for a friend to design the logo, Ferguson described its "creative rationale" as including, "[t]he shield design is to represent the law enforcement capacity of the task force members." Doc. 62-2, Ex. B7, at 5. Suttle and King did not object to this characterization of Task Force member's roles,[7] and according to a document titled "Animal Cruelty Task Force Fiscal Year 2009," the Task Force spent $759.03 on "500 Embroidered patches for identification of law enforcement officers." Doc. 62-2, Ex. B9, at 7. Plaintiffs contend that this evidence further demonstrates that Suttle, King, and Ferguson understood the Task Force to possess a law enforcement role; that Suttle and King delegated law enforcement authority to Ferguson; and that Ferguson acted in a law enforcement capacity when she went on raids. Therefore, they assert, Suttle is liable for Ferguson's actions.

The Court finds that none of this evidence proves Suttle's supervisory liability for any alleged constitutional violations committed by Ferguson. Under *Ashcroft v. Iqbal*, a government official may not be held liable for the unconstitutional acts of his or her subordinate solely under a theory of *respondeat superior*. 556 U.S. 662, 676 (2009). Rather, a plaintiff must allege that the official has violated the Constitution "through the official's own individual actions." *Id.* Thus, supervisory liability attaches where a supervisor "creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which 'subjects, or causes to be subjected' that plaintiff 'to the deprivation of any rights . . . secured by the Constitution." *Id.*; *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (same).[8]

---

[7] The Court notes, however, that the Task Force has also been described as "a coalition of every law enforcement agency in the state" and that the majority of its members were law enforcement officers independent of their association with the Task Force. *See*, *e.g.*, Doc. 67-1, Ex. E, at 9.

[8] Under *Dodds v. Richardson*, supervisory liability requires three elements: that the defendant "(1) promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional violation." 614 F.3d 1185, 1199 (10th Cir. 2010). Suttle also argues, in his original Motion for

Here, Plaintiffs allege that such liability exists for two reasons. First, they assert that supervisory liability may be found where a supervisor displays "knowledge of and acquiescence in a constitutional violation," and that such circumstances exist here. *Dodds v. Richardson*, 614 F.3d 1185, 1196 (10th Cir.) (referring to pre-*Iqbal* case law); *Jenkins v. Wood*, 81 F.3d 988, 995 (10th Cir. 1996) (plaintiff may satisfy the requirements for supervisory liability by "showing that the defendant-supervisor . . . had actual knowledge of the violation and acquiesced in its continuance"). Although Plaintiffs have effectively shown that Suttle knew that (1) raids of properties on the suspicion of illegal cockfighting were taking place, (2) Ferguson was taking part in these raids, (3) at least some of these raids resulted in birds being euthanized, and (4) a raid occurred on Plaintiffs' property during which their birds were destroyed, these acts in themselves do not constitute constitutional violations. They are unconstitutional only if undertaken in the absence of a valid warrant or probable cause and without due process. Even taking the evidence in the light most favorable to the Plaintiffs, they have not shown that Suttle knew either that Ferguson gave knowingly false statements that rendered invalid the warrant to search their ranch, or that she gave false statements to the local officers that essentially coerced Plaintiffs into consenting to the destruction of their birds without due process. Suttle did not review the warrants issued in these cases, which were issued by the local law enforcement agencies, not the Attorney General's Office. Nor was he present during the raids to witness the destruction of the poultry without due process.[9] Therefore, Plaintiffs have not shown that he knew of or acquiesced in any constitutional violation.

---

Summary Judgment, that he did not act with the required state of mind. Doc. 17 at 7-8. Because the Court resolves this motion on *Dodds*' first two prongs, it does not address the issue of Suttle's mental state.

[9] Further, although other plaintiffs have raised similar claims in other lawsuits against some or all Defendants, alleging illegal search and seizure and destruction of poultry in other raids, Plaintiffs have offered no evidence that the suits had been filed or Suttle was aware of the allegations at the time of the raid on their ranch.

Second, Plaintiffs assert that because "a supervisor or municipality may be held liable where there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable," *Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1988), Suttle is liable due to his failure to train Ferguson in property owners' Fourth, Fifth, and Fourteenth Amendment rights. *See also Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1988) (finding municipal liability where "a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations") (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997)). The Court finds that Plaintiffs have not met this standard. Although the new evidence suggests that Ferguson worked closely with local law enforcement in planning and executing the raids, it does not show that Ferguson directed or controlled the local law enforcement officers in any way. None of the evidence shows that Ferguson, rather than local law enforcement, had a duty to execute warrants or seize poultry from the owners. Therefore, even if Suttle supervised Ferguson's behavior on the raids, he had no obligation to train her in Fourth, Fifth, and Fourteenth Amendment law to fulfill duties she did not hold. Further, the alleged violations boil down to Ferguson knowingly making false statements to the local law enforcement officers. There is no evidence that Suttle had reason to believe that Ferguson would lie about the investigation, or needed to be trained not to lie to law enforcement. Consequently, Suttle had no reason to think that the alleged false statements were "almost inevitable" without appropriate training.

Accordingly, the Court finds that Plaintiffs have failed to show a sufficient causal link between Suttle's supervision and Ferguson's alleged constitutional violations, and their Motion to Reconsider is **DENIED**.

**SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE